STERN & HERFF CORP. *v.* UNITED STATES

**No. 7638.**—Invoice dated Oloron, France, February 16, 1938. Certified February 23, 1938. Entered at New York, N. Y., March 8, 1938. Entry No. 825530.

Second Division, Appellate Term

(Decided December 21, 1948)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the appellant.
*David N. Edelstein*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellee.

Before LAWRENCE and TILSON, Judges; RAO, J., not participating

TILSON, Judge: This application for review of the decision and judgment of the lower court was filed under the provisions of section 501 of the Tariff Act of 1930. The merchandise consists of wool knit berets imported from France and entered at the port of New York on March 8, 1938. "100 doz. Berets OK White nus #9" were invoiced and entered at 35 francs per dozen, and were appraised at 42.75 francs per dozen, less 3 per centum and 2 per centum, packed, on the basis of foreign market value. "50 Doz. Berets OK White nus #9½" were invoiced and entered at 35 francs per dozen and were appraised at 45.60 francs per dozen, less 3 per centum and 2 per centum, packed, on the basis of foreign market value. In addition to the above appraisement under section 402 of the Tariff Act of 1930, the appraiser made the following report under the Antidumping Act of 1921:

(351)

WOOL BERETS SIZE #9:

Unit foreign market value on date of purchase
(Sec. 205) _____ 40.6382 Fr. Fcs.
Net per doz. pkd.

Unit purchase price (Sec. 203) _____ 38.20 Fr. Fcs.
Net per doz. pkd.

Unit foreign market value on date of exportation
(Sec. 205) _____ 40.6382 Fr. Fcs.
Net per doz. pkd.

WOOL BERETS SIZE #9½:

Unit foreign market value on date of purchase
(Sec. 205) _____ 43.3474 Fr. Fcs.
Net per doz. pkd.

Unit purchase price (Sec. 203) _____ 38.20 Fr. Fcs.
Net per doz. pkd.

Unit foreign market value on date of exportation
(Sec. 205) _____ 43.3474 Fr. Fcs.
Net per doz. pkd.

It was shown during the trial that the entry of the berets as above set out was on the basis of export value.

Appellant's assignment of errors is as follows:

1. In finding and holding that the basis for appraisement of the berets in question is foreign value under Section 402 (c) Tariff Act 1930 and that the appraised values, both under the Anti-Dumping Act of 1921 and the Tariff Act of 1930, are the proper values for Tariff purposes, and

2. that each size had its fixed price at which it was freely offered in the principal (foreign) market.

3. In not making allowance for cash discount, taxes, packing costs, differences in measurement, sizes and colors in comparing foreign and export values under Section 402 Tariff Act 1930 and the Anti-Dumping Act 1921 and for difference in quantities under Section 202 (b) Anti-Dumping Act 1921.

4. In not holding that the dutiable value is the export value under Section 402 Tariff Act 1930.

5. In not finding and holding that because the foreign manufacturer conducted its business in such a manner as to realize an equal margin of profit on sales for home consumption as well as for export to the United States, the Anti-Dumping Act does not apply.

6. In not finding and holding that the Anti-Dumping Act 1921 does not apply after making due allowance for differences in quantities of sales made in the foreign market for home consumption and for export to the United States.

The record consists of the testimony of two witnesses and an affidavit, marked exhibit 2, offered by appellant, and two special agent's reports, marked exhibits 3 and 4, offered by appellee. The trial court frankly stated that it attached little weight to the statements contained in exhibit 4 because said report refers to a period prior to the date of the exportation of the instant merchandise when the selling price for the export market was higher than the price paid by appellant, and the further fact that said report, showing merchandise sold for home consumption, relates to transactions consummated several

months prior to the date of exportation of the instant merchandise. In this view we concur.

The record shows that these berets are sold for export to the United States on a cash basis at a uniform price for all sizes and colors in quantities of from 1,500 dozen to 10,000 dozen, and that sales for home consumption are usually on a credit basis and at different prices for the various sizes, the white berets being offered and sold at higher prices than the colored berets. In connection with the sales for home consumption being made on a credit basis, the record shows that these berets are also sold for cash, and when so sold, there is allowed a 2 per centum discount for cash.

It is contended by counsel for appellant that the merchandise sold for home consumption is different from the berets sold for export to the United States. "It is a different commodity, in that in the home market they are sold at so much for each individual size, and that cannot reasonably be compared with the sales for exportation of half a dozen different sizes and colors, including whites." When counsel for appellant was asked by the court if that was his ground for saying that the merchandise sold for home consumption was different from that sold for export, counsel replied in the affirmative, and added that he did not claim that there was a difference in structure or in the character of the merchandise *per se*.

In this connection, counsel for appellant, in his argument before the court, stated:

\* \* \* I concede that in the home market the berets that are sold there, in size and structure—to use your Honor's phrase—are substantially the same as those that are sold for export. But it is the method by which they are priced for export, and have been for a period of 10 years, to group them all at an average price for all sizes or colors, including whites, which makes it commercially impossible to compare them with the individual sizes that are sold in France at each individual price, and a higher price for whites.

The cases cited by counsel for appellant in support of the above contention are readily distinguishable from this case. In disposing of the above contention, the trial court stated:

\* \* \* In each of the cited cases, the court found that the usual method of buying and selling the particular merchandise under consideration was at an average price, and accordingly held the average price to be the proper dutiable value. The same condition does not apply to the articles under consideration. There was, at the time of exportation of the berets in question, a definite foreign market value therefor. It is true that different prices prevailed for both sizes, but each size had its fixed price at which it was freely offered in the principal market.

The above finding by the trial court is amply supported by the record, and no argument has been presented which would justify us in disturbing the same.

Counsel for appellant in oral argument before this court made the following statement:

Now, if this court finds that the merchandise which is sold in the home market in single sizes, at a specific price for each size, can be compared with the price at which we have purchased for exportation to the United States 7 or 8 sizes, at an average price for all sizes and colors, including whites, then we have no case under the Tariff Act, because the price of sale for the usual wholesale quantity, we will say 10 dozen, in France will justify the appraisement under the Tariff Act in this case at bar.

It is not our view that merchandise is compared with prices, or that prices are compared with merchandise in determining dutiable value of merchandise. On the contrary, merchandise is compared with merchandise and prices with prices. Counsel for appellant has conceded that the berets sold in the home market, in size and structure, are substantially the same as those that are sold for export, and this is fully established by the record. The trial court was, therefore, correct in holding that "There was, at the time of exportation of the berets in question, a definite foreign market value therefor."

Referring specifically to assignment of error No. 3, alleging that the trial court erred:

In not making allowance for cash discount, taxes, packing costs, differences in measurement, sizes and colors in comparing foreign and export values under Section 402 Tariff Act 1930  *  *  *

it would appear that the amount of each of these items for which counsel for appellant now contends the trial court should have made allowance in comparing foreign and export values under section 402 of the Tariff Act of 1930, is a matter of proof. An examination of the record fails to disclose any evidence establishing the amount of any one of the above items, and said counsel has not in either his brief or oral argument pointed out any such evidence to this court. It is true that the record shows an 8 per centum tax which applies to home consumption sales and which does not apply to export sales, but when, as in this case, it is established that there is a foreign value and an export value, counsel has cited no authority which would justify us in deducting this 8 per centum home consumption tax before determining in accordance with section 402 of the Tariff Act of 1930 which of said two values is higher. Nor is there any evidence in this record which tends to show that this 8 per centum tax is not properly a part of foreign value.

Upon a full consideration of the entire record, it is our view that the trial court was correct in finding that the proper basis of appraisement was foreign value, and also in finding and holding that the proper foreign value of the instant merchandise was the appraised values under section 402 (c) of the Tariff Act of 1930.

Turning now to the question of the dumping duties under the Anti-dumping Act of 1921, counsel for appellant contends the trial court erred in not making allowance for difference in quantities under section 202 (b) of the Antidumping Act of 1921, and in not finding and holding that because the foreign manufacturer conducted its business in such a manner as to realize an equal margin of profit on sales for home consumption as well as for export to the United States, the Antidumping Act does not apply.

As to the first contention, there is no evidence before us to show that the appraiser did not make due allowance for the amount of the difference between the purchase price and the foreign market value, if any, due to the fact that the wholesale quantities, in which such or similar merchandise is sold or freely offered for sale to all purchasers for exportation to the United States in the ordinary course of trade, are greater than the wholesale quantities in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country of exportation in the ordinary course of trade for home consumption.

We are not informed either by the official papers or by the record made before the trial court just how the appraiser arrived at the unit foreign market value on date of purchase (section 205) of 40.6382 French fcs. net per dozen packed, or how he arrived at the unit purchase price (section 203) of 38.20 French fcs. net per dozen packed, or how he arrived at the unit foreign market value on date of exportation (section 205) of 40.6382 French fcs. net per dozen packed for the wool berets, size #9. However, under the law, these figures are presumptively correct, and it is the burden of the party who challenges their correctness to prove by proper evidence that those figures are erroneous. This, in our opinion, the appellant herein has failed to do. Except as to the figures, the situation is the same as to the wool berets, size #9½.

The fact that the foreign manufacturer might have conducted its business in such a manner as to realize an equal margin of profit on sales for home consumption as well as for export to the United States is far short of the facts necessary to require a holding that the Anti-dumping Act does not apply.

Upon the record as a whole, we find as facts under section 402 of the Tariff Act of 1930:

1. That the merchandise herein consists of wool berets, sizes #9 and #9½, exported from France and entered at the port of New York on March 8, 1938.

2. That Oloron, France, was one of the principal markets for the sale of such or similar merchandise.

3. That these wool berets were freely offered and sold for home consumption in usual wholesale quantities of 10 dozen or less in the

principal markets and in the ordinary course of trade in France at 42.75 French fcs. per dozen, less 3 per centum and 2 per centum, packed, for size #9, and at 45.60 French fcs. per dozen, less 3 per centum and 2 per centum, packed, for size #9½.

4. That these wool berets are also freely offered for sale and sold for exportation to the United States in usual wholesale quantities of 3,000 dozen in the principal markets of France and in the ordinary course of trade, at 35 French fcs. per dozen, plus packing, as invoiced.

Under the Antidumping Act of 1921, we find as facts:

5. That as to wool berets, size #9:

> The unit foreign market value on date of purchase (Sec. 205) was_____ 40.6382 Fr. Fcs. Net per doz. pkd.
>
> The unit purchase price (Sec. 203) was__ 38.20 Fr. Fcs. Net per doz. pkd.
>
> The unit foreign market value on date of exportation (Sec. 205) was_____ 40.6382 Fr. Fcs. Net per doz. pkd.

That as to wool berets, size #9½:

> The unit foreign market value on date of purchase (Sec. 205) was_____ 43.3474 Fr. Fcs. Net per doz. pkd.
>
> The unit purchase price (Sec. 203) was__ 38.20 Fr. Fcs. Net per doz. pkd.
>
> The unit foreign market value on date of exportation (Sec. 205) was_____ 43.3474 Fr. Fcs. Net per doz. pkd.

We conclude as matter of law:

That the proper dutiable value of the wool berets in question is the foreign value, under section 402 (c) of the Tariff Act of 1930, as set out in finding of fact #3 above.

That the proper value of the berets under the Antidumping Act of 1921, is as set out in finding of fact #5 above.

The judgment of the trial court is accordingly affirmed. Judgment will be rendered accordingly.